895 F.2d 953
 William S. SMITH; Paula Kettlewell; Wayne B. Aranson;
James J. Baker; Daniel S. Alexander; Douglas W. Kanney;
James W. Pence; B. Eliot Singer; Jean M. Quigley; Cynthia
K. Davis, Plaintiffs-Appellees,
and
James F. McDonald, Plaintiff,
v.
COUNTY OF ALBEMARLE, VIRGINIA, Defendant-Appellant,
Northside Baptist Church; Living Hope Chapel; Maranatha
Christian Fellowship; Providence Foundation; Reverend
William Templeton; Reverend Richard A. Whittaker; Reverend
Greg R. Davis; Reverend Russell Stroup; Lois G. Stroup;
Reverend Lewis D. Templeman; Reverend Ralph S. Carter;
Reverend Mark A. Beliles; Stephen K. McDowell; Norman T.
Brinkman; Georgia C. Brinkman; Bill Kincaid; Anne
Kincaid; Ronald J. Gilbert; Ann S. Gilbert; Thomas W.
Gilliam; Diane Gilliam; Michael A. Coffey; Debra B.
Coffey; Richard H. Rubenoff; Lynn Rubenoff; Sheila
Richardson; Reverend John Manzano; Reverend Curtis L.
Gibson; Eileen D. Gibson; Susie S.K. Waldron; Elizabeth
Parrott; Mark L. Marhoefer, Amici Curiae,
and
Timothy Lindstrom; Joseph Henley; Edward H. Bain, Jr.;
Patricia Cooke; Richard Bowie; Peter Way, Defendants.
 No. 88-2973.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 13, 1989.
Decided Feb. 8, 1990.
Rehearing and Rehearing In Banc Denied March 28, 1990.
 
 George R. St. John (St. John, Bowling & Lawrence, Charlottesville, Va., on brief), for defendant-appellant.
 James Jeffrey Knicely (Graber, Knicely & Cotorceanu, Charlottesville, Va., Roy W. Ferguson, Jr., Wharton, Aldhizer & Weaver, Harrisonburg, Va., John W. Whitehead, The Rutherford Institute, Charlottesville, Va., on brief), for amici curiae.
 Dexter Brock Green, for plaintiffs-appellees.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and BLATT, Chief District Judge for the District of South Carolina, sitting by designation.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Here we approach one of the most entangled areas with which courts must be concerned under the First Amendment to the United States Constitution. That document provides in pertinent part:
 
 
 2
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech....
 
 
 3
 U.S. Const.Amend. I. The clause requires us to make decisions as to the application of "establishment of religion," "free exercise [of religion]," and "the freedom of speech" as those terms apply to a situation involving the erection of a nativity scene on the front lawn of the Albemarle County Office Building in Charlottesville, Virginia.
 
 
 4
 The plaintiffs, six Christian or Unitarian ministers, a Jewish Rabbi, and three private individuals of various religious backgrounds, are residents of Albemarle County, Virginia. They sued the Board of Supervisors and the County of Albemarle under 42 U.S.C. Sec. 1983 for declaratory and injunctive relief, alleging that the Board of Supervisors violated the plaintiffs' Establishment Clause rights by permitting the local chapter of the Jaycees to erect a creche on the front lawn of the County Office Building. Judge Michael, of the United States District Court for the Western District of Virginia, granted summary judgment for the plaintiffs, 699 F.Supp. 549 (1988), and the County now appeals.
 
 
 5
 Initially we must address an assertion, first raised on appeal, that the plaintiffs lack standing.[1] While that contention might otherwise be regarded as coming too late, it presents a question of jurisdiction vel non and thus must be considered.
 
 
 6
 The County has advanced, by supplemental brief, a claim that the plaintiffs, who are taxpayers and residents of Albemarle County, absent actual economic injury, have no standing to bring an Establishment Clause claim against the County. Recent authority, however, contradicts such an assertion. See Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (Pawtucket residents have standing to challenge the city's inclusion of a creche in its annual display); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (parent has standing to challenge school prayer statute); Allegheny County v. ACLU, --- U.S. ----, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (local residents and local chapter of ACLU have standing to challenge the propriety of Allegheny County's display of a creche and city of Pittsburgh's display of a Menorah). See also L. Tribe, American Constitutional Law Sec. 3-16, at 118-19 (2d ed. 1988) ("Interests sufficient to raise questions under the establishment clause of the first amendment may be asserted not only by criminal defendants and by taxpayers, but by all who can show a direct and concrete impact upon themselves from the action questioned."). The standing of plaintiffs is, therefore, established and we turn, then, to the claim regarding the establishment of religion.
 
 
 7
 All pertinent facts have been stipulated by agreement of the parties. Immediately prior to December 2, 1987, the Charlottesville-Albemarle Jaycees asked the Albemarle County Board of Supervisors for permission to place a nativity scene on the front lawn of the Albemarle County Office Building. At their meeting of December 2, 1987, the Board of Supervisors, by a vote of four to two, allowed the display of the nativity scene. The front lawn of the County Office Building is a grassy expanse located at one of the busiest intersections in Charlottesville. The County Office Building itself is a large brick building with a designation as the "Albemarle County Office Building" prominently displayed on the front of the building clearly above and behind the location of the creche. The American and Virginia flags flank the front of the building and are also in the general line of vision when viewing the creche. The creche consisted of large figures, easily visible, and illuminated at night. The creche was erected on December 6, 1987, and remained until January 10, 1988. No other seasonal symbols accompanied the display. The creche had no secular content. The erection and maintenance of the creche involved no expenditure of County funds. Immediately after the creche had been erected, an 18 inch by 6 inch sign reading "Sponsored by Charlottesville Jaycees" was placed next to the creche. After suit protesting establishment of religion was filed on December 14, 1987, a larger and more specific disclaimer sign was placed next to the creche.[2]
 
 
 8
 The site has been the location of the County Office Building only since 1981. However, since that time, the lawn has been used sporadically for occasional activities: a beauty pageant, a billboard for the United Way, two Easter "sunrise" services, several assorted weddings, municipal band concerts, and a civil rights demonstration.
 
 
 9
 Despite the fact that the building is the office building for Albemarle County, it is located in downtown Charlottesville. It is a highly visible location. Indeed, the president of the Jaycees testified that he sought to erect the creche in that location because of the site's visibility. He insisted, however, that the choice of that property was not motivated by the lawn's location in front of the County Office Building.
 
 
 10
 In deciding how the particulars of the situation fit with earlier legal tests for determining violations of the Establishment Clause, the district court took particular note of the following aspects of the display. First, the creche consisted of large figures, readily visible, and brightly lit at night. Second, the creche was displayed for a five-week period. Finally, and most significantly, the creche was displayed in the context of a government site. That is, one could not readily view the creche without also viewing the trappings and identifying marks of the state. This visual association was, in the district court's view, unmistakable and impossible to sever.
 
 
 11
 Subsequent to the district court disposition of the case, the Supreme Court, in County of Allegheny v. ACLU, --- U.S. ----, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), clarified the involved and delicate Establishment Clause balancing act required when evaluating a religious display in a public context. The district court's present opinion could have been written with Allegheny County before it. Judge Michael employed the same analysis and evaluated the same factors endorsed by the Supreme Court in Allegheny County to reach a result fully comporting with the Supreme Court's recent pronouncement.
 
 
 12
 A brief review of Allegheny County's rationale demonstrates the correctness of Judge Michael's reasoning. From the collection of opinions in Allegheny County, central adjudicative principles must be distilled. A majority of the Supreme Court found the display of a creche, in circumstances very similar to those at bar, unconstitutional, and the display of a Menorah, with significant associated secular aspects not present here, constitutional.
 
 
 13
 The Court continued to base its Establishment Clause calculus on the three "tests" of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)--"a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." Allegheny County, 109 S.Ct. at 3100 (citing Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111). Focusing on the second Lemon prong, primary effect (the only portion of the district court's reasoning contested in both Allegheny County and the case at bar), the Court continued to emphasize that the Establishment Clause is violated when a given governmental practice has the appearance or effect of endorsing religion. In such circumstances, adopting the views expressed by Justice O'Connor in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (concurring), a finding of "endorsement" is predicated on a review of the nature and context of the contested object, "what viewers may fairly understand to be the purpose of the display." Allegheny County, 109 S.Ct. at 3102 (quoting Lynch, 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring)). Thus, a "particular physical setting" is critical--"[e]very government practice must be judged in its unique circumstances to determine whether it [endorses] religion." Lynch, 465 U.S. at 694, 104 S.Ct. at 1370.
 
 
 14
 Reviewing the physical setting of the displays in Lynch and Allegheny County, the Court engaged in a fact specific analysis. The display of the creche in Lynch and the Menorah in Allegheny County were upheld; the display of the creche in Allegheny County was not. The circumstances surrounding the display at issue here are strikingly similar to those the Court found unconstitutional in Allegheny County.
 
 Looking to Lynch, the Court analyzed:
 
 15
 the Pawtucket creche, seen in the context of that city's holiday celebration as a whole. In addition to the creche, the city's display contained: a Santa Claus House with a live Santa distributing candy; reindeer pulling Santa's sleigh, a live 40-foot Christmas tree strung with lights; statues of carolers in old-fashioned dress; candy-striped poles, a "talking" wishing well, a large banner proclaiming "SEASONS GREETINGS"; a miniature "village" with several houses and a church; and various "cut-out" figures, including those of a clown, a dancing elephant, a robot, and a teddy bear. See 525 F.Supp. 1150, 1155 (RI 1981). The concurrence concluded that both because the creche is "a traditional symbol" of Christmas, a holiday with strong secular elements, and because the creche was "displayed along with purely secular symbols," the creche's setting "changes what viewers may fairly understand to be the purpose of the display" and "negates any message of endorsement" of "the Christian beliefs represented by the creche." 465 U.S., at 692, 104 S.Ct. at 1369.
 
 
 16
 Allegheny County, 109 S.Ct. at 3102-03.
 
 
 17
 The Court found the Menorah in Allegheny County was combined with sufficient secular symbolism to create "an overall holiday setting." See Lynch, 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). It was placed next to a much larger Christmas tree, which the Court found typified a "secular celebration of Christmas":
 
 
 18
 The tree, moreover, is clearly the predominant element in the city's display. The 45-foot tree occupies the central position beneath the middle archway in front of the Grant Street entrance to the City-County Building; the 18-foot menorah is positioned to one side. Given this configuration, it is much more sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa. In the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season. In these circumstances, then, the combination of the tree and the menorah communicates, not a simultaneous endorsement of both Christian and Jewish faith, but instead, a secular celebration of Christmas coupled with an acknowledgment of Chanukah as a contemporaneous alternative tradition.
 
 
 19
 Allegheny County, 109 S.Ct. at 3113-14. Further, a sign placed next to the display announced a salute to liberty:
 
 
 20
 While no sign can disclaim an overwhelming message of endorsement, see Stone v. Graham, 449 U.S. 39, 41 [101 S.Ct. 192, 193, 66 L.Ed.2d 199] (1980), an "explanatory plaque" may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs. See Lynch, 465 U.S., at 707 [104 S.Ct., at 1377] (Brennan, J., dissenting). Here, the Mayor's sign serves to confirm what the context already reveals: that the display of the menorah is not an endorsement of religious faith but simply a recognition of cultural diversity.
 
 
 21
 Given all these considerations, it is not "sufficiently likely" that residents of Pittsburgh will perceive the combined display of the tree, the sign, and the menorah as an "endorsement" or "disapproval ... of their individual religious choices." Grand Rapids [v. Ball ] 473 U.S. [373,] at 390 [105 S.Ct. 3216, 3226, 87 L.Ed.2d 267]. While an adjudication of the display's effect must take into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to either of these religions, ibid., the constitutionality of its effect must also be judged according to the standard of a "reasonable observer." See Witters v. Washington Dept. of Services for the Blind, 474 U.S. 481, 493 [106 S.Ct. 748, 754, 88 L.Ed.2d 846] (1986) (O'Connor, J., concurring in part and concurring in judgment); see also Tribe, at 1296 (challenged government practices should be judged "from the perspective of a 'reasonable non-adherent' "). When measured against this standard, the menorah need not be excluded from this particular display. The Christmas tree alone in the Pittsburgh location does not endorse Christian belief; and, on the facts before us, the addition of the menorah "cannot fairly be understood to" result in the simultaneous endorsement of Christian and Jewish faiths. Lynch, 465 U.S., at 693 [104 S.Ct., at 1369] (O'Connor, J., concurring). On the contrary, for purposes of the Establishment Clause, the city's overall display must be understood as conveying the city's secular recognition of different traditions for celebrating the winter-holiday season.
 
 
 22
 Allegheny County, 109 S.Ct. at 3114-15.
 
 
 23
 In contrast the Court found the creche in Allegheny County to be indisputably religious. Situated in the main hallway of the County Office Building, it consisted of a nativity scene, framed by a floral pattern, surrounded by a sign "Gloria in Excelsis Deo." No secular symbols or artifacts were associated with the display.[3] The Court found that the creche's setting, nature, and effect contributed unmistakably to a message of government endorsement of religion.[4]
 
 
 24
 Here, too, the creche was not associated with any secular symbols or artifacts. The creche was situated on the front lawn of the County Office Building--a prominent part, not only of the town, but of the county office structure itself. Prominent in the background is the sign identifying the building as a government office structure. As in Allegheny County, "[n]o viewer could reasonably think that it occupies this location without the support and approval of the government." 109 S.Ct. at 3104. Absent any contrary indication, the unmistakable message conveyed is one of government endorsement of religion--impermissible under the Establishment Clause of the Constitution. The endorsement of the religious message proceeds as much from the religious display itself as from the identification of a religious sponsor.
 
 
 25
 Albemarle County attempts to distinguish the Charlottesville situation from Allegheny County on several grounds. The later disclaimer affixed near the figures is certainly more unequivocal than those in Allegheny County. The relatively small size of the disclaimer, however, in relation to the whole of the display, mitigates its value. It remains to be seen whether any disclaimer can eliminate the patent aura of government endorsement of religion. In effect, such an aura defeats Albemarle County's attempt to argue for a remedial measure short of total removal of the creche.
 
 
 26
 The County has also argued that the front lawn of the County Office Building is a public forum, thus raising countervailing First Amendment-Free Speech concerns to any absolute Establishment Clause prohibition. Such an argument was specifically preserved in Allegheny County. 109 S.Ct. at 3104 n. 50.
 
 
 27
 Essentially, Judge Michael found that whether the lawn is or is not a public forum[5] is not dispositive. The critical gauge of any such content-related speech restriction is whether the overall context and nature of the restricted display conveys the impermissible message of governmental endorsement of religion.
 
 
 28
 The defendants' basic claim is that, as the lawn is a "public forum," any restriction on their symbolic speech based on its religious content would violate their First Amendment free speech rights. Considering that assertion, the district court found that the Supreme Court has identified three types of fora: the public forum, the non-public forum and the designated public forum. Cornelius v. NAACP Legal Defense and Education Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Evaluating the county property, the district court found that, while the courthouse lawn may not have a long history of use for speech activities, the type of setting--the lawn in front of a seat of government--is similar to other settings found to be a traditional public forum. Clark v. Community for Creative Nonviolence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (Lafayette Park and the Mall); United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (Supreme Court grounds); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (municipal courthouse); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (state capitol grounds). The district court further found that even if the lawn is not a traditional forum, it is at least a "designated public forum," since the County had promulgated rules for admitting displays to the lawn. See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447. It is clear that the government can enforce a content based speech regulation in a public forum only when the regulation serves a compelling state interest and is narrowly drawn to achieve that end. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447 ("[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest.").
 
 
 29
 The district court decided that here the contravention to the principles of the Establishment Clause was so great as to supply such a compelling interest. The court examined Supreme Court precedent addressing the conflict between free speech and the Establishment Clause. It determined that, although the separation of church and state mandated by the Establishment Clause is, in the abstract, a compelling state interest, a policy of equal access to a public forum does not necessarily offend the Establishment Clause unless it cannot meet the test outlined in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). See Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). In Widmar, the Court found that equal access to an open forum, in that instance the use of state university buildings by a religious group, would not implicate any of the Lemon factors. Here, however, the situation is different. The district court found the primary effect prong of Lemon is contravened by a prominent religious display in a government setting. The associational message is more severe than a simple policy of access to vacant school rooms.[6] As the display unmistakably conveyed an "endorsement," it also unmistakably violated Lemon, therefore justifying some restriction on an otherwise available public forum.[7]
 
 
 30
 Given a compelling state interest to remove any suggestion of governmental endorsement of religion, the district court found the most narrowly tailored means available to be outright exclusion. In this conclusion, too, logic, both factual and legal, supports the court's reasoning. If a disclaiming sign is not sufficient to alter the message of endorsement, it is paradoxical to conclude that requiring such a disclaimer serves as a more narrowly tailored regulation.
 
 
 31
 For related reasons, we do not, on the facts before us, encounter a prohibition of the free exercise of religion. Excluding the creche from government property is a justifiable, indeed a necessary, restriction but by no means a prohibition. See Grand Rapids School Dist. v. Ball, 473 U.S. 373, 382, 105 S.Ct. 3216, 3221, 87 L.Ed.2d 267 (1985) (solution to tension between free exercise clause and establishment clause is to guard individual right to worship while requiring that government "maintain a course of neutrality among religions, and between religion and non-religion.").[8]
 
 
 32
 In sum, the reasoning and holding of the district court are sound, comport presciently with the Supreme Court's recent pronouncement in Allegheny County, and, therefore, are
 
 
 33
 AFFIRMED.
 
 BLATT, District Judge, dissenting:
 
 34
 The majority holds that a creche, displayed on what is admittedly a public forum, must be removed because its placement gives the appearance of governmental "endorsement" of religion. While I agree with much of the majority's legal interpretation of the Allegheny County opinion, I do not feel that the mandate of Allegheny County, reaches the situation present here, and I, therefore, respectfully dissent.
 
 
 35
 The majority begins its analysis of the case by characterizing Allegheny County as "clarif[ying] the involved and delicate Establishment Clause balancing act required when evaluating a religious display in a public context." Supra at 956. I cannot agree with such a characterization; indeed in Allegheny County, the Supreme Court noted that the creche involved there, placed as it was inside the stairway of the courthouse, did not "raise the kind of 'public forum' issue" involved in cases such as Widmar and McCreary. 109 S.Ct. at 3104, n. 50. While later in their opinion, the majority takes note of this distinction--at page 958--they then seem to ignore such distinction and accept Allegheny County as controlling in all respects.
 
 
 36
 While I do not take lightly the potential Establishment Clause problems this case presents, I feel that the location of the creche here involved on an admitted public forum is a factor that merits closer examination. The Free Speech Clause of the First Amendment has been the subject of numerous cases. As noted by the district court and the majority, the government can enforce regulation of "speech in a public forum only when such regulation is narrowly drawn to protect a "compelling state interest."[1] The analysis employed by the district court, and approved by the majority, uses the "endorsement" test of Allegheny County and applies it to the Free Speech "compelling interest" test. While there is a certain logic to the usage of these two First Amendment tests, I do not feel that the merger of these standards comports with the spirit and intent of the protection of free speech.
 
 
 37
 It is undisputed that religious speech is protected speech. See Widmar, 454 U.S. at 269, 102 S.Ct. at 2, and cases cited therein. In this case, the county government recognized that fact and, consistent with its pre-existing policy of allowing any group to utilize the lawn for a display, allowed the Jaycees to use the public forum. See J.A. 12-14. By ordering removal of the creche, the majority and the district court are forcing the county to advance the rights guaranteed by the Establishment Clause at the expense of the right of free speech. I feel that when these competing rights are involved, a strict application of Allegheny County 's endorsement test is inappropriate; the Supreme Court made it clear in footnote 50 of Allegheny County that it was not ruling on a situation in which these two fundamental rights conflicted.
 
 
 38
 In the absence of a mandate from the Supreme Court on the "head-to-head" clash of these two competing First Amendment rights, I feel that this court is faced with two alternatives. One option, which I would adopt, is to move away from a strict application of the "endorsement" test found in Allegheny County, and to incorporate the public forum factor into the calculus of the "Establishment" equation. This would involve even more of a "case-by-case" analysis, but the Court has made it clear that such a fact specific evaluation must be employed in a case such as this. 109 S.Ct. at 3103. Indeed, following the language of Allegheny County, "the effect of a creche display turns on its setting." Id. I submit that, while on the facts of Allegheny County the Court admittedly was referring to the secular trappings surrounding the religious displays, its specific refusal to reach the public forum conflict suggests that all courts must also consider the location of the display. In the case at bar, the "setting" is a public forum, a "setting" traditionally afforded great protection by the Constitution and the courts. On the facts of this case, therefore, I feel that the public forum setting of an admittedly religious display must be given as much consideration as the secular trappings surrounding the menorah in Allegheny County.[2] Applying such an analysis, I submit that the Establishment Clause has not been violated. Viewing the creche and the disclaimer sign alongside,[3] at a location where other groups have been allowed to convene and/or erect displays, should cause neither the court nor the public to believe that Albemarle County was endorsing the Christian religion.
 
 
 39
 Should this modification of the "setting" test be incorrect, I still must respectfully dissent from the majority's conclusion and offer another alternative. Upon finding an Establishment Clause violation, the majority here then moved to the Free Speech Clause of the First Amendment. They found the violation of the Establishment Clause to be a "compelling state interest" and then held that the "least restrictive means" of protecting the state interest was total exclusion of the creche from the Charlottesville lawn. Having already voiced my disagreement with the finding of an Establishment Clause violation, I must agree that, if such a violation is present, surely it would qualify as a "compelling state interest." It is with the majority's holding that complete exclusion of the creche is the least restrictive means of accommodating such a state interest that I also disagree.
 
 
 40
 The majority gives short shrift to the issue of disclaimer signs and states, "[i]t remains to be seen whether any disclaimer can eliminate the patent aura of government endorsement of religion." Supra at 958 (emphasis in original). With that statement, the majority finds it inescapable that the ordinary viewer would find the display, with or without the disclaimer sign, to be an endorsement of religion and, therefore, impermissible. In making these findings, the majority quotes from, and presumably relies on, Allegheny County. In Allegheny County, however, the sign was not truly a "disclaimer" sign. It stated, "This Display Donated by the Holy Name Society." Allegheny County, 109 S.Ct. at 3094. The language of Allegheny County's sign "len[t] [the government's] support to the communication of a religious organization's religious message." Allegheny County, 109 S.Ct. at 3105. It was this "support" the Supreme Court found to be tantamount to endorsement.
 
 
 41
 The disclaimer sign posted on the Albemarle County lawn read, "Sponsored and Maintained by the Charlottesville-Albemarle Jaycees, Not by Albemarle County." The majority does note that the instant sign is more "unequivocal than those in Allegheny County." Supra at 958. It does not, however, elaborate on the major difference in the language of the disclaimers. Anyone who read the Albemarle sign knew that the county did not "endorse" the creche scene. Indeed, the Supreme Court noted in Allegheny County that, "[w]hile no sign can disclaim an overwhelming message of endorsement ... an 'explanatory' plaque may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs." Id. at 3114-15 (citations omitted). If the wording on any "explanatory plaque" could convey to the reader that a government did not sponsor a certain religion or religious belief, certainly the unequivocal language used by Albemarle County should suffice.
 
 
 42
 The majority notes that the relatively small size of the disclaimer sign "mitigates its value." Supra at 958. I agree that the size of any disclaimer sign is an important factor in determining the effectiveness of the government's disavowal of a "religious" message. The district court notes that the first sign was 18" X 6" and was replaced by a "larger" sign. J.A. at 118-19. No reference is made in the record as to the second sign's exact size, and there was some dispute about that issue at oral argument. Rather than total exclusion of the creche, I feel that a remand to the district court to direct the county to erect a sign of sufficient size to make it clearly apparent to every viewer that the creche was not endorsed by the county would be one method that would legally meet the "least restrictive means" test, and thus avoid allowing Establishment Clause rights to unnecessarily trammel the right of free speech.
 
 
 43
 While I agree that not every sign effectively disclaims governmental involvement in "religious" displays in every "setting," certainly the language in this disclaimer on a sign of appropriate size, under the facts of the "setting" in this particular case, will sufficiently convey a message of "non-endorsement" to anyone who reads it, and, thus, the delicate Establishment Clause "balancing act test" will be met.
 
 
 
 [1]
 The motion for leave to file an amended complaint, addressing that aspect in more detail, while granted, does not alter the conclusion reached independently of the amended complaint
 
 
 [2]
 The disclaimer added after suit was filed read "Sponsored and maintained by Charlottesville-Albemarle Jaycees not by Albemarle County."
 
 
 [3]
 Counsel for the defendants/appellants candidly admitted at oral argument the absence, in the Charlottesville creche, of any secular symbols
 
 
 [4]
 The creche in Allegheny County, like the one here, bears a sign disclosing its ownership by a private organization. The Allegheny County Court found that this did not alter the conclusion:
 The fact that the creche bears a sign disclosing its ownership by a Roman Catholic organization does not alter this conclusion. On the contrary, the sign simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own. But the Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations. See, e.g., Texas Monthly, supra (government support of the distribution of religious messages by religious organizations violates the Establishment Clause). Indeed, the very concept of "endorsement" conveys the sense of promoting someone else's message. Thus, by prohibiting government endorsement of religion, the Establishment Clause prohibits precisely what occurred here: the government's lending its support to the communication of a religious organization's religious message.
 Allegheny County, 109 S.Ct. at 3105.
 
 
 [5]
 The front lawn though used for such events as weddings and concerts does not have the traditional indicia of a free speech forum associated with a public park
 
 
 [6]
 The district judge stated:
 In Widmar, the message of endorsement was absent but here it is present. What does or does not seem like endorsement will depend in large measure upon the expectations related to the context within which the speech takes place. With a setting like Widmar, such as a student activity center or other open fora in a college setting, there is a clear expectation that various groups will use the facilities. Here the display took place at the symbolic center of government. In Widmar, the Supreme Court found that no imprimatur of state approval would be transmitted through an open access policy in that case. But here, because of the nature, size, location, and duration of the display, and its relation to the symbolic center of government, the appearance of a government imprimatur upon a certain religious ideology is present.
 Smith v. Lindstrom, 699 F.Supp. 549, 565 (W.D.Va.1988).
 
 
 [7]
 The district court also correctly distinguished McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), where the court validated a private creche display in a public park. In McCreary, the court construed Lynch as establishing a sweeping bright line rule that the display of creches does not violate the Establishment Clause, a view that is patently incorrect in light of Allegheny County. Further, as the district court noted, the physical setting in McCreary did not convey the same aura of endorsement as that contained in both Allegheny County and here. Judge Michael's reasoning thus only extends the physical setting mode of analysis, espoused by Justice O'Connor in Lynch, 465 U.S. 668, 692, 104 S.Ct. 1355, 1369, and adopted by the Court in Allegheny County for general Establishment Clause cases, to the area where the competing First Amendment rights of free speech and separation of church and state overlap
 
 
 [8]
 For a case involving many of the same problems and arriving at the same result, see Kaplan v. Burlington, Vt., 891 F.2d 1024 (2d Cir.1989)
 
 
 [1]
 The district court found the Albemarle County Courthouse lawn to be either a traditional public forum or a designated public forum. J.A. at 152. As noted by the district court, regardless of the characterization as a traditional public forum or a designated public forum, the test is the same. See Cornelius v. NAACP Legal Def. and Educ. Fund, 473 U.S. 788, 780, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985)
 
 
 [2]
 Additionally, the county erected a disclaimer sign next to the creche proclaiming that the creche was sponsored by a civic group and not by the county itself. The presence and content of the sign should also be factored into the court's study of the entire "setting." The disclaimer sign is discussed more fully on pages 961 through 962 of this opinion, infra
 
 
 [3]
 No reference has been found in the record of the exact size of the second disclaimer sign. It was, however, "larger" than 18" X 6". J.A. at 118-19