147 F.3d 832
 127 Ed. Law Rep. 607, 98 Cal. Daily Op. Serv. 4015,
98 Daily Journal D.A.R. 5555
 Jane DOE, on her own behalf and on behalf of her two
children; Doe 1; Doe 2; Plaintiffs-Appellants,
v.
MADISON SCHOOL DISTRICT NO. 321; Board of Trustees of
District No. 321; Jim Terry, Member of Board; Ann Hancock,
member of Board; John Bagley, member of Board; Norman
Erickson, member of Board; Gary J. Summers, member of
Board; T.C. Mattocks, Dr., Defendants-Appellees.
 No. 97-35642.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 6, 1998.
Decided May 27, 1998.
 
 Stephen L. Pevar (argued) and D. Bernard Zaleha, American Civil Liberties Union, for the appellants.
 James B. Lynch (argued), Lynch & Associates, Boise, ID, for the appellees.
 Appeal from the United States District Court for the District of Idaho Edward J. Lodge, District Judge, Presiding. D.C. No. CV-90-00518-EJL.
 Before: BROWNING, WRIGHT, and O'SCANNLAIN, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether a school district's policy regarding student graduation pronouncements violates the Establishment Clause of the First Amendment.
 
 
 2
 * Jane Doe, on behalf of herself and her child, challenges on its face the high school graduation policy on student speakers that is administered by the Madison School District # 321 (the "District"), which is located in Rexburg, Idaho.[1] Pursuant to the policy, a minimum of four students are invited to speak at commencement exercises according to academic class standing. If a student accepts the invitation, she decides individually the content of her pronouncement. She may choose to deliver "an address, poem, reading, song, musical presentation, prayer, or any other pronouncement." In no case may the school administration "censor any presentation or require any content." At most, it can "advise the participants about the appropriate language for the audience and occasion"; but the student-speaker is free to reject the advice.
 
 
 3
 Seeking injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, Doe brought a facial challenge to the school's policy under the Establishment Clause.[2] Her theory was that--by allowing students to inject prayers and religious songs into the graduation program--the policy perpetuates a long-standing practice of officially sanctioned religious graduation ceremonies.[3] She claimed that under both the "coercion" test of Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and the Lemon test, Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the policy cannot pass constitutional muster. The district court, however, disagreed and sua sponte granted summary judgment for the District.
 
 
 4
 Doe timely appealed, but does not appear to have sought a post-judgment stay.
 
 II
 
 5
 * Doe contends that the district court erred in holding her case distinguishable from Lee v. Weisman, in which the Supreme Court prohibited a school from selecting clergy to offer prayers as part of a public school graduation ceremony. See Lee, 505 U.S. at 598-99. Stressing the social pressures that might coerce a student to attend the ceremony and to participate respectfully, and underscoring the control which the school possessed over the contents of the graduation program, the Lee Court held such religious activity to be violative of the Establishment Clause. Doe maintains that Lee compels a reversal of the district court's summary judgment in the present case.
 
 
 6
 We disagree. Lee did not purport to erect a per se rule against religious activity in public school graduation ceremonies. Quite the contrary, the Court specifically pointed out two "dominant facts" which "mark[ed] and control[led] the confines" of its decision. Id. at 586, 112 S.Ct. 2649. Although one of these facts--the pressures on a student to attend graduation and to conform with her peers--may well be present here, and thus cannot serve as a distinction, the other fact--the significant control exerted by the school on the religious contents of the graduation program--is missing. Indeed, it is the absence of this control which saves the graduation policy at issue from facial constitutional invalidation.
 
 
 7
 In Lee, state officials "direct[ed] the performance" of the religious exercise. Id. Not only did the State, through the school board, decide affirmatively to include prayer, but it also selected the clergyman who would deliver the prayer and even provided him with guidelines prescribing the content of that prayer. See id. at 587-88, 112 S.Ct. 2649. The Court emphasized, "[t]he degree of school involvement ... made it clear that the graduation prayers bore the imprint of the State." Id. at 590, 112 S.Ct. 2649. Moreover, "[e]ven if the only sanction for ignoring the instructions [on scripting the prayer] were that the rabbi would not be invited back, ... no religious representative who valued his or her continued reputation and effectiveness in the community would incur the State's displeasure in this regard." Id. at 588, 112 S.Ct. 2649. The school's selection of the speaker and provision of the guidelines were thus tantamount to composing the prayer itself, an action which is clearly prohibited by the Establishment Clause. See id.
 
 
 8
 In contrast to these telling facts, the facial provisions of the policy at issue here include three distinct features. First, students--not clergy--deliver the presentations. Second, these student-speakers are selected by academic performance, a purely neutral and secular criterion. Third, once chosen, these individual students have autonomy over content; the school does not require the recitation of a prayer, but rather leaves it up to the student whether to deliver "an address, poem, reading, song, musical presentation, prayer, or any other pronouncement." The significance of these features cannot be overstated. Indeed, three of the judges in the five-member Lee majority made special note that:
 
 
 9
 If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State.
 
 
 10
 Id. at 630 n. 8, 112 S.Ct. 2649 (Souter, J., concurring).[4] Under the Madison School District's policy, control vests in the individual students, not the State.[5] Hence, on the face of the policy, the school cannot be charged with "direct[ing] the performance" of a religious exercise. Id. at 586, 112 S.Ct. 2649.
 
 B
 
 11
 Doe nevertheless argues, quoting one of our precedents, that we cannot draw a distinction between "school authorities actually organizing the religious activity and officials merely 'permitting' students to direct the exercise." Collins v. Chandler Unified Sch. Dist., 644 F.2d 759, 761 (9th Cir.1981). In Collins, we considered whether a public school could permit the student council to open assemblies with prayer. See id. at 761-63. Holding that it could not, we rejected the school's contention that the policy was a mere accommodation of students' religious desires, and concluded that the grant of permission constituted an impermissible state "sponsorship" of religious activity. See id. According to Doe, Collins precludes us from distinguishing Lee v. Weisman.
 
 
 12
 Collins does not stand for the proposition that any state acquiescence in religious speech at public school assemblies gives rise to an Establishment Clause violation. It can't. As the Supreme Court recognized in Lee, "[t]he First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." Lee, 505 U.S. at 589 (emphasis added). Put simply, the Supreme Court's precedents make clear that the First Amendment requires the government to maintain a position of neutrality toward religion. See, e.g., Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."); Committee for Public Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 792-93, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion."). The school's action in Collins was assuredly not neutral. The school did not merely permit individual students, selected on a secular basis, to decide for themselves what to say; rather, it tapped a "select group of students" in the "social mainstream" for the specific purpose of leading prayer. See Collins, 644 F.2d at 762. The practice undoubtedly raised concerns that the state was fostering religion.
 
 
 13
 By contrast, the policy at issue in this case is neutral on its face; it selects student speakers based on academic merit and then gives them free rein over the content of the presentations.[6] Control over content rests in autonomous individuals. As Doe herself concedes, "[o]n its face, [the policy] imposes no limit on the content of the speech." We must thus reject her facial challenge under Lee v. Weisman; when a state uses a secular criterion for selecting graduation speakers and then permits the speaker to decide for herself what to say, the speech does not bear the imprimatur of the State.[7]
 
 III
 
 14
 Doe also argues that the District's graduation policy fails the Lemon test. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105 (1971). Under Lemon, the school district's policy must survive a three-pronged inquiry:
 
 
 15
 First, the [policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [policy] must not foster "an excessive government entanglement with religion."
 
 
 16
 Id. at 612-13, 91 S.Ct. 2105. Applying this test, the district court upheld the Madison School District's graduation policy.
 
 
 17
 * Applying Lemon, we begin by analyzing the policy's purpose. A law fails this initial prong of the Lemon test only if it was "motivated wholly by an impermissible purpose." Bowen v. Kendrick, 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (emphasis added); see also Lynch v. Donnelly, 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The district court found that the school's graduation policy on its face was motivated, at least in part, by a number of secular purposes, including a desire to grant top students the autonomy to deliver an uncensored speech. Unwilling to trivialize the importance of bestowing responsibility on young adults at this significant moment in their student careers, we agree. See Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963, 966 (5th Cir.1992) ("A meaningful graduation ceremony can provide encouragement to finish school and the inspiration and self assurance necessary to achieve after graduation, which are secular objectives.").
 
 
 18
 Doe has provided us with no persuasive reason to conclude otherwise. She simply contends that the authorization to deliver prayer evidences a religious motivation. The flaw in her argument is quite clear: By focusing specifically on the inclusion of prayer in the listed options, as opposed to the student-speaker policy as a whole, she addresses the wrong level of particularity. Were we to adopt her approach, then any government acceptance of religious activity might violate the Establishment Clause; perhaps tautologically, any accommodation of religion has the unmistakable non-secular purpose of accommodating religion. See Lynch, 465 U.S. at 680, 104 S.Ct. 1355 ("Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause."). Such an approach is prohibited by Supreme Court jurisprudence recognizing religious freedoms, see, e.g., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (secular purpose requirement "does not mean that the law's purpose must be unrelated to religion--that would amount to a requirement 'that the government show a callous indifference to religious groups' "); Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952) ("[W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."), if not by the text of the Constitution itself, see U.S. Const. amend. I ("Congress shall make no law ... prohibiting the free exercise [of religion]."). We thus conclude that on its face the District's graduation policy has a secular purpose.
 
 B
 
 19
 As for whether the policy has the primary effect of advancing religion, we do not believe that a policy that on its face permits student speech on any subject of the student's choice has the primary effect of advancing religion. By allowing any speech the student chooses, the policy "neither advances nor inhibits religion." See Lemon, 403 U.S. at 612, 91 S.Ct. 2105. While an independent student choice to read a prayer may have a religious effect, this is not the effect of the policy on its face. See Witters v. Washington Dep't of Services for the Blind, 474 U.S. 481, 487, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). The policy does not mandate or direct that prayers be read, and may or may not result in prayer at all. Even if a prayer is read, the policy does not make this an act of establishment by the school district. "[T]o have forbidden 'effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." Corporation of Presiding Bishop, 483 U.S. at 337, 107 S.Ct. 2862 (emphasis in original).
 
 
 20
 Moreover, further reducing the chance that the graduation ceremonies could have the effect of advancing religion, the District policy requires a disclaimer in every printed program. The disclaimer, in full, reads:
 
 
 21
 Any presentation by participants of graduation exercises is the private expression of the individual participants and does not necessarily reflect any official position of Madison School District # 321, its Board of Trustees, administration or employees or indicate the views of any other graduate.
 
 
 22
 The Board of Trustees of the Madison School District # 321 recognizes that at graduation time and throughout the course of the remedial process, there will be instances when religious values, religious practices and religious persons will have some interaction with the public schools and students. The Board of Trustees, however, does not endorse religion, but recognizes the rights of individuals to have the freedom to express their individual political, social, or religious views, for this is the essence of education.[8]
 
 
 23
 These paragraphs make clear to the audience that any religious solemnizing in the student presentations is student-initiated and student-led. But see Kreisner, 1 F.3d at 784 n. 5; Black Horse Pike, 84 F.3d at 1482, 1487. Without the force of the state behind the speech, its propensity to advance religion is greatly reduced. See id. at 251.
 
 C
 
 24
 Finally, we must decide whether the District's policy on its face would produce excessive entanglement with religion.[9] In Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court stated that an open forum policy would avoid entanglement, and even noted that the school "would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech.' " Id. at 272 & n. 11, 102 S.Ct. 269. Such an effort would force the school into the "impossible task" of deciding which words and activities fall within the concept of religion. See id. at 272 n. 11, 102 S.Ct. 269.
 
 
 25
 We similarly conclude that on its face the District's policy does not excessively entangle government and religion. Although the graduation ceremony is not a public forum, and although school officials participate in the event by way of funding it and appearing on stage with the student speakers, the fact remains that on its face the policy is neutral with respect to religion. See, e.g., Agostini v. Felton, 521 U.S. 203, ----, 117 S.Ct. 1997, 2016, 138 L.Ed.2d 391 (1997) (holding constitutional a federally funded program providing remedial instruction on "neutral basis," even though instruction was given on premises of sectarian school by government employees); Bowen, 487 U.S. at 613-18, 108 S.Ct. 2562 (holding constitutional "facially neutral" law providing funds for family planning, even though activities were carried out by organizations with religions affiliations). Moreover, the school would more likely become entangled with religion if it tried to eradicate all religious content from student presentations; such an attempt would likely require the school to censor the student speeches before the ceremony and to interrupt any renegade student who autonomously initiated sectarian solemnizing. See Board of Educ. v. Mergens, 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion of O'Connor, J.) ("[A] denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech....").
 
 
 26
 Thus, we conclude that the District's graduation policy survives the Lemon test. On its face, the policy has a secular purpose, its primary effect is not the advancement of religion, and it does not excessively entangle church and state.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 Doe filed this case using a pseudonym because she feared retaliation by the community. The district court judge met in chambers with Doe, without defense counsel present, to determine whether she has standing. The court concluded she does have standing, and we have so confirmed
 Because Doe has alleged a particularized interest in the graduation ceremony, we need not rely on her standing as a taxpayer. See Lee v. Weisman, 505 U.S. 577, 584, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). In any event, the record indicates that Doe is a taxpayer in Madison County. The Supreme Court has, on many occasions, recognized the standing of taxpayers to challenge Establishment Clause violations. See, e.g., Bowen v. Kendrick, 487 U.S. 589, 618, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); School District of the City of Grand Rapids v. Ball, 473 U.S. 373, 379 n. 5, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), overruled on other grounds by Agostini v. Felton, 521 U.S. 203, ---- - ----, 117 S.Ct. 1997, 2006-17, 138 L.Ed.2d 391 (1997); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).
 
 
 [2]
 "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The Establishment Clause has been made applicable to the States through the Fourteenth Amendment. See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)
 
 
 [3]
 Doe appended to her motion for summary judgment the high school's official commencement programs from 1988 through 1995. These programs reveal that both an Invocation and a Benediction were included as part of the school's graduation ceremony in all eight years
 
 
 [4]
 Justice Souter was joined by Justices Stevens and O'Connor
 
 
 [5]
 Indeed, the District's policy requires that the audience be informed who controls the content of the student presentation; the printed programs must state:
 Any presentation by participants of graduation exercises is the private expression of the individual participants and does not reflect any official position of Madison School District # 321, its Board of Trustees, administration or employees or indicate the views of any other graduate.
 (emphasis added). While the existence of a disclaimer is not "dispositive," it "reinforces the reasonable observer's perception of no government sponsorship." Kreisner v. City of San Diego, 1 F.3d 775, 784 n. 5 (9th Cir.1993); see Stone v. Graham, 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); ACLU v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1482, 1487 (3d Cir.1996) (en banc); Smith v. County of Albemarle, 895 F.2d 953, 958 (4th Cir.1990).
 
 
 [6]
 As the district court said, "the result could be different if the facts are slightly altered"; in other words, our decision is based upon the literal terms of the policy and a facial challenge to it. We do not consider how student speakers are actually being chosen, nor whether they in fact have autonomy in determining the content of their speeches. Moreover, the high concentration of Mormons in Rexburg, community sentiments, and any possibility that the District will not strictly adhere to the policy are irrelevant to Doe's facial challenge and to our decision
 
 
 [7]
 We note that we are not reaching the question addressed by two of our sister circuits: Can school boards allow students to decide by majority vote to have religious exercises at graduation? See ACLU v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471 (3d Cir.1996) (en banc) (no); Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963 (5th Cir.1992) (yes). Such practice, as one commentator explained, creates a "danger that a majority will bring intimidating pressures to bear in favor of a particular religion," a danger which is not present when a school chooses a speaker through a neutral method and allows her to speak freely. See Recent Case, 110 Harv. L.Rev. 781, 783 (1997)
 
 
 [8]
 It appears from the record that on two prior occasions, only the first paragraph appeared in the program. For purposes of this opinion, however, we assume that the full text required by the policy will appear in future programs
 
 
 [9]
 Recently, the Supreme Court merged into one determination the second and third steps of the Lemon test: that is, the "effect" and "excessive government entanglement" prongs. See Agostini v. Felton, 521 U.S. 203, ----, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997) ("Regardless of how we have characterized the issue ..., the factors we use to assess whether an entanglement is 'excessive' are similar to the facts we use to examine 'effect.' "). It is unclear, however, whether the Court would engage in the same consolidated analysis outside of the context of government aid to students attending parochial schools. Nevertheless, because separating the "effect" and "entanglement" steps does not alter our outcome, we will follow the traditional tripartite Lemon schematic