**John and Patti DEMMON, et al., Plaintiffs,**

v.

**LOUDOUN COUNTY PUBLIC SCHOOLS, et al., Defendants.**

**No. CIV.A. 1:03cv365.**

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 15, 2004.

Charles Douglas Welty, C. Douglas Welty PC, Arlington, VA, for Plaintiffs.

E. William Chapman, Reed Smith LLP, Leesburg, VA, for Defendants.

## AMENDED MEMORANDUM OPINION

CACHERIS, District Judge.

At issue in this case is whether a public school violates the Free Speech and Establishment Clauses of the United States and Virginia Constitutions when it removes bricks inscribed with the Latin cross, purchased by parents and relatives of school students and graduates, from the school's "walkway of fame," located on school property.

The Court holds that having created a limited public forum, the school engaged in impermissible viewpoint discrimination against expression with a religious viewpoint. For the reasons stated below, the Court will enter summary judgment in favor of the Plaintiffs.

### I. Background

Beginning in 2001, a parent group associated with Loudoun County Public Schools, Parents Associated With the School ("PAWS"), initiated a fund-raising project through which PAWS solicited sales of engraved bricks that would create a "walkway of fame" on Potomac Falls High School property ("PFHS" or the "High School"). PAWS began developing the idea of a inscribed brick walkway as a fund-raiser during the 1999–2000 school year. (Slusher Aff. ¶¶ 7, 34.) During the 2000–01 school year, the president of PAWS approached Principal Griffith about the "walk of fame." (Slusher Aff. ¶ 10.) Principal Griffith and Assistant Superintendent of LCPS, Evan Mohler, approved the design, location, and proposed construction of the walkway as being acceptable from a site planning and engineering perspective. (PSMF ¶¶ 20–21.) PAWS oversaw the fund-raiser, including the following: advertising; processing the orders; collecting money; selecting symbols; and installing bricks. (Slusher Aff. ¶¶ 14, 15, 20, 24–27, 29, 30–33.) Defendant E.

Wayne Griffith ("Griffith") had the authority to approve additional symbols. (Griffith Dep. at 22–23.)

The walkway is located in a prominent area generally surrounding three flagpoles, near the main entrance of PFHS. (Pl. Stat. of Uncontested Material Facts ¶¶ 2–3 ("PSMF").) The walkway is accessible to the general public and is crossed by students, parents, school personnel, participants in school-sanctioned activities, and members of the public. (PSMF ¶ 4.) Students may walk over the bricks to get to the school, but can also easily avoid them.

The bricks were regular red pavers, etched with lasers to create the writing and symbols. (Def.Ex. 24.) The engraved bricks contain a variety of names, emblems, and slogans. (PSMF ¶ 9.) In addition to a written message, purchasers of bricks were permitted to select symbols from one of several lists published by PAWS for an additional charge of five dollars. (PSMF ¶ 22.) Some symbols were added and others were dropped from the published list of symbols from time to time at the request of PAWS. (PSMF ¶ 23.) The only religious symbol on any of the several lists published in the PAWS brochure or the PFHS newsletters was the Latin cross. (PSMF ¶ 24.) The manufacturer of the bricks offered a stock "clip art" library of symbols, including the Latin cross and a Star or David; the manufacturer could engrave special symbols, corporate logos and the like for an additional charge. (PSMF ¶ 25.) Some prospective brick purchasers requested of PAWS that different symbols (i.e. gymnastics, hockey, thespian masks, and lacrosse sticks) be made available for purchase; those symbols were approved and purchased. (PSMF ¶ 27.)

PAWS offered the option of placing symbols on the bricks in order to raise more money. PAWS solicited parents and family members of students to purchase bricks, which could be inscribed with a personalized message and/or certain symbols. (Def.Ex. 12–16.) Twenty-four symbols were available to be inscribed on the bricks, mainly symbols identified with school-sponsored extra-curricular activities (i.e., soccer, volleyball, music, and drama). (Def.Ex. 18, 19, 21.) The only religious symbol available was the Latin cross.[1]

In January of 2003, Principal Griffith received a letter complaining about the bricks bearing the Latin cross in the walk of fame. (Griffith Dep. at 6–8.) After consulting with PAWS and counsel, the decision was made to remove the bricks inscribed with the Latin cross. In February 2003, Griffith, the Principal of PFHS, informed those persons who had purchased bricks inscribed with the Latin cross that such bricks had been removed from the "walkway of fame" due to potential legal problems associated with allowing religious symbols on school property. (*Id.* at 12–13.) Replacement bricks, containing only the student's name and year of graduation, were to be provided by the school. (*Id.*) Purchasers were also refunded the additional five dollars they had paid to have the symbol appear on their bricks.

Plaintiffs John and Patti Demmon ("the Demmons"), Roger Marcum ("Marcum"), Terri Nickerson ("Nickerson"), and Christa Robinson ("Robinson") are parents of current or former PFHS students who purchased bricks inscribed with the Latin cross through the PAWS fund-raiser.

---

1. The Latin cross has been described by courts as a cross where the base stem is longer than the other three arms of the cross. *Harris v. City of Zion,* 927 F.2d 1401 (7th Cir.1991). Both parties to this case agree that the Latin cross is a symbol of Christianity.

Those bricks were all removed in February 2003. Plaintiffs Alan and Karen Hansen and their son Jonathan Hansen (collectively, the "Hansens"), would like to purchase a brick with Jonathan's name and a Latin cross on it during the upcoming 2003–04 school year. (Compl. ¶ 3.14.)

The Latin cross is no longer permitted to be inscribed on the bricks. Under a new school board policy implemented on March 25, 2003, bricks and other permanent attachments to school property are "limited to no more than the name of the student or staff member and the class, grade, or year of which that student or staff person is a member." (Def.Ex. 2.)

On March 24, 2003, Plaintiffs filed suit in this Court against Defendants Loudoun County Public Schools and the Loudoun County School Board, the governing body of PFHS, (collectively, the "School"); Dr. Edgar Hatrick ("Hatrick"), the Superintendent of the School; Griffith; and certain John Doe Individuals, Governmental Entities, and Corporations. Plaintiffs allege that Defendants' conduct in removing the bricks inscribed with the Latin cross and eliminating the Latin cross as an available symbol for inscription on the bricks was in violation of 42 U.S.C. § 1983, specifically that, under color of state law, Defendants violated Plaintiffs' rights under the (I) Free Speech Clause of the United States Constitution; (II) Free Speech Clause of the Virginia Constitution; (III) Establishment Clause of the United States Constitution; (IV) Establishment Clause of the Virginia Constitution; (V) Free Exercise Clause of the United States Constitution; and (VI) Free Exercise Clause of the Virginia Constitution. Plaintiffs sought declaratory relief and immediate return of the bricks inscribed with the Latin cross to the "walkway of fame."

On April 18, 2003, the named Defendants filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court granted the Defendants' motion as to Plaintiff's free exercise claim, but refused to dismiss the counts alleging violations of the freedom of speech and establishment clauses. The parties have subsequently filed cross-motions for summary judgment. They agreed during their final pre-trial conference that this matter can be resolved as a matter of law on summary judgment. The Court fully agrees, as the relevant material facts are not in dispute. These cross-motions for summary judgment are currently before the Court.

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Evans v. Technologies Applications & Serv., Co.*, 80 F.3d 954, 958–59 (4th Cir.1996) (citations omitted). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir.1991) (citations omitted).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 248–52, 106 S.Ct. 2505. Rather, the Court must determine whether the record as a whole could lead a reasonable trier of fact to find for the non-movant. *Id.* at 248, 106 S.Ct. 2505.

## III. Analysis

The Court will address the following issues in turn: (1) whether the cause of

action is moot, because the Defendants have closed the forum; (2) did the removal of the bricks violate Plaintiffs' freedom of speech rights; (3) whether the removal of the bricks constituted a violation of the Establishment Clause.

### A. Mootness

■ Defendants contend that this case is moot, because they have closed the "walk of fame" as a forum for any expressive activity. Defendants argue that they have implemented a policy that restricts bricks and other permanent attachments to school property to "the name of the student or staff members and the class, grade, or year of which that student or staff person is a member." (Def. Stat. of Undisputed Mat. Facts ¶ 34 ("DSMF").)

The mootness doctrine is primarily a function of the Article III "case or controversy" limitation on the jurisdiction of the Federal courts. *American Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 605 (4th Cir.2001). Federal courts may only hear present, live controversies and must avoid issuing "advisory opinions on abstract propositions of law." *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1249 (4th Cir. 1991).

Closing a forum is a permissible solution to problems reconciling the Establishment and Free Speech clauses of the First Amendment. *See DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 970 (9th Cir.1999). "The government has an inherent right to control its property, which includes the right to close a previously open forum." *Id.*

Defendants' argument that the controversy is moot is unpersuasive. The forum has not been sufficiently "closed" to render the instant case moot. The gravamen of Plaintiffs' claim is that the school has censored their speech only because of its religious content while tolerating secular speech on the same subject matter. The school has not resolved this controversy in a fashion sufficient to render it moot. The school has not removed the bricks bearing secular symbols, like the horseshoe or panther paw. (*See* Pl.Ex. 20–29.) Restricting the bricks to names and dates does not undo the fact that only bricks containing the Latin cross were removed from the walkway while bricks containing non-religious symbols remain.

Closing a forum entails removing all expressive activity and censoring all new speech. The forum would have been "closed" had the school removed all of the inscribed bricks. *Cf. DiLoreto*, 196 F.3d at 963, 970 (removing *all* of the advertisements from high school's baseball field fence rather than posting an advertisement containing the ten commandments did not constitute viewpoint discrimination). Accordingly, the Court holds that the Defendants have not sufficiently "closed" the forum to render the case moot, because the bricks bearing the secular symbols remain, while bricks from an allegedly religious viewpoint have been excluded.

### B. Violation of the Free Speech Clause

Plaintiffs assert that Defendants violated their right to free speech by discriminating against Plaintiffs' speech on the basis of its religious viewpoint and removing the bricks engraved with the Latin cross. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech[.]" U.S. Const. amend. I; *see also* Va. Const. art. I, § 12 ("the General Assembly shall not pass any law abridging the freedom of speech...."). Despite the rather absolute nature of the language in the First Amendment, courts have recognized certain situations where schools may permissibly regulate speech. *See, e.g., Hazel-*

*wood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

Defendants argue that their actions in this case were permissible for the following reasons: (i) the "walkway of fame" is a nonpublic forum and the School Board's actions were reasonable and appropriate for the forum; (2) the removal of the bricks was a reasonable restriction on school-sponsored speech; (3) if the walkway is a limited public forum, the school's actions were reasonable under the "external" standard, or, alternatively, if the "internal" standard applies, the Defendants had a compelling interest in regulating the content of the speech.

Plaintiffs' argument is more simply stated: the School Board engaged in unlawful viewpoint discrimination, which is unlawful in any forum. Moreover, Plaintiffs contend that the School Board's fear of violating the Establishment Clause is chimerical and cannot support a compelling interest. The Court agrees with the Plaintiffs; the Defendants engaged in impermissible viewpoint discrimination by removing Plaintiffs' bricks from the walkway.

### 1. Protected Speech

The first inquiry the Court must undertake is to determine whether the Plaintiff engaged in "protected speech." *Goulart v. Meadows,* 345 F.3d 239, 246 (4th Cir.2003). Defendants do not challenge that the symbol of the Latin cross is protected speech. "[P]ictures, films, paintings, drawings, and engravings ... have First Amendment protection ...." *Kaplan v. California,* 413 U.S. 115, 119–20, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); *see also Anderson v. Mexico Acad. & Cent. Sch.,* 186 F.Supp.2d 193, 202 (N.D.N.Y.2002). Moreover, private speech

does not lose its protection under the First Amendment simply because it contains a religious message. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) ("private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."). The Latin cross on the bricks constitutes protected speech under the First Amendment. It communicates ideas to the viewer and is indistinguishable from any other form of symbolic expression traditionally protected under the First Amendment. *See Kaplan,* 413 U.S. at 119, 93 S.Ct. 2680. Of course, "protected speech" may still be regulated under certain circumstances. *See, e.g., Hazelwood,* 484 U.S. at 273, 108 S.Ct. 562.

### 2. Type of Forum

A finding that the Plaintiffs engaged in "protected speech" is only the first step in the analysis; the Court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Goulart,* 345 F.3d at 246. Once the Court identifies the type of forum, it must "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius,* 473 U.S. at 797, 105 S.Ct. 3439; *Goulart,* 345 F.3d at 246.

A school district, like any other private owner of property, "may legally preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 390, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (citations omitted). The degree of control the school district

may exercise over expression on its property, however, depends upon the nature of the forum. *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum. *Goulart,* 345 F.3d at 248 (citing *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)); *Warren v. Fairfax County,* 196 F.3d 186, 193 (4th Cir.1999). The first category of government property, the traditional public forum, is a place that "by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Goulart,* 345 F.3d at 248 (citing *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948). "The government may not prohibit all expressive activity in a traditional public forum, and content-based restrictions on speech are valid only if they are narrowly tailored to serve a compelling state interest." *Id.* "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* The classic public fora are public parks, streets, or meeting halls. *See id.* at 248 n. 8.

The second category of government property, the nonpublic forum, is not open by tradition or designation to the public for expressive activity. *Id.* at 248 (citing *Cornelius,* 473 U.S. at 803, 105 S.Ct. 3439). The government "can restrict access to a nonpublic forum 'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (citing *Forbes,* 523 U.S. at 677–78, 118

S.Ct. 1633). "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 248–49 (citing *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439).

The third category of government property, the designated public forum, is property which the government has opened for expressive activity to the public, or some segment of the public. *Id.* at 249 (citing *Warren,* 196 F.3d at 193). A designated public forum can only be created by "purposeful government action" in which "the government must intend to make the property 'generally available.'" *Id.*

There is some confusion over the terminology used to describe this third category, as the Supreme Court and lower courts have also used the term "limited public forum." *Id.* The terms "designated public forum" and "limited public forum" are two names for the same forum. *Id.* "The final category [is the s]o-called 'designated public fora' (often called 'limited public fora')". Using the terms "designated" and "limited" interchangeably, we explained that "[a] designated public forum can be opened only to a limited class of speakers or for limited topics." *Id.* When the government has established a limited public forum, the government "is not required to and does not allow persons to engage in every type of speech." *Id.* (citing *Good News Club,* 533 U.S. at 106, 121 S.Ct. 2093). The government "may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" *Id.* (alteration in original) (quoting *Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). To date, the Supreme Court has recognized two types of government property that clearly are lim-

ited public fora: public school facilities during after school hours and a student activities fund of a public university. *Id.* at 250.

■ In this case, the Court is persuaded that the "walk of fame" is a limited public forum. Considering the first type of public fora, in its prior opinion this Court determined that the walkway did not constitute a traditional public forum. *See Demmon*, 279 F.Supp.2d at 694. The discovery process has not revealed any evidence that would cause the Court to revisit this issue. The school did not throw open the walkway to indiscriminate public expression. Unlike a public park, street, or meeting hall, an inscribed brick walkway is not a traditional forum used for assembly or debate. The "walk of fame" is not a traditional public forum.

■ Considering the remaining choices of fora, the parties disagree on whether the walkway constitutes a limited public forum or a nonpublic forum. The Plaintiff argues that the selection of a particular type of forum in this case is irrelevant, because viewpoint discrimination is proscribed in all of them. The Court, however, mindful of the Fourth Circuit's admonition in *Goulart*, will begin the analysis by classifying the forum before reaching the issue of viewpoint discrimination.

The touchstone of determining the type of forum is the intent of the governmental actor in creating the forum. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. Courts must look to the following to discern the government's intent: (1) the policy and practice of the state actor to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum; (2) the nature of the property; (3) and its compa-

tibility with expressive activity. *Id.* As the first element states, the *stated* intention of state actor is not dispositive; the practices and action of the school are also relevant.

Under the first prong of the *Cornelius* analysis, the Court finds that the Defendants intended to open the walkway to student expression. PAWS and the school intended the "walk of fame" to be a fund raising activity. PAWS developed the walkway in consultation with various school officials, including Principal Griffith, about the general nature and design of the walkway. (PSMF ¶ 20.) It is undisputed that an effort to raise funds was the original intent behind creating a "walk of fame." (*See* Def. Ex. A–B.) Prior to the creation of the "walk of fame," the walkway was not open for public expression, i.e. members of the public were not permitted to inscribe their own messages upon the bricks. The school intended that the purchase of bricks be limited to students, their families, and individuals who wished to honor students or PFHS employees. (Slusher Aff. ¶ 7.)

The fund-raiser was an economic transaction between the school and the students, facilitated by PAWS. The idea behind the "walk of fame" was a simple one, commonly used in fund-raising drives: donors provide money in exchange for a limited amount of expression. Alumni of seemingly every academic institution donate money in exchange for some recognition by the school. Whether the donor's name is inscribed on a new football stadium or a tiny brick, the donor receives a limited amount of expression in exchange for his or her donation.

Defendants contend that they did not intend to create a forum for public expression. This argument is belied by the minutes of the PAWS meeting, the "walk of fame" advertising materials, and the bricks themselves. While certainly the school did

not intend to create a public message board to unbridled expression, the school not only allowed, but also encouraged brick purchasers to express their feelings about their favorite student or faculty members. (*See* Def. Ex. 12 ("Personalized Bricks are a unique gift to recognize your children, your family, your grandchildren, coaches, sponsors, and/or teachers.")) Initially, PFHS did not limit the expression of donors to the "walk of fame" to their names or class year. At the PAWS meeting on February 7, 2000, the members of the board suggested "that the brick contain the name of the student, the date of graduation, *and a selected phrase.*" (Def. Ex. 7C at 2.) According to the brochure, the inscribed brick would be left at PFHS "forever" and create a "lasting memory" of the student. (Def.Ex. 13.) Like most fund-raising drives, the amount of expression increased with the amount of the donation; inscribing a brick with a symbol cost five dollars extra. (Slusher Aff. ¶ 19.) PAWS intended that the bricks would permit each purchaser a certain amount of expressive activity.[2] PFHS did not impose any restrictions on the phrases that could adorn the bricks. Until the instant dispute arose, the school did not review or censor the content of the text messages on the bricks. (Griffith Dep. at 28–30.)

Certainly most of the bricks contain only the student's graduating year or messages related to the student's accomplishments. (*E.g.* Def. Ex. 6 ("Tim Edney[:] Defensive Player of the Year '99"; "David Guinter[:] 2001 State Champs"; "Cory Everett[:] 'Most Artistically Talented'").) Other bricks, however, contain more personal messages. (*E.g. id.* ("Scott Dowdle[:] Keeping it Real"; "Chris[:] Hit it Hard

Somewhere! Love MDAV"; "Adil Khan[:] The Real Deal Class of 2001").) The Court finds that PAWS and PFHS intended to open up the walkway for a limited amount of expression related to the students, their family, coaches, sponsors, or teachers. Therefore, the Court finds that the walkway is not a nonpublic forum, because there was an intent to create a public forum for limited expression by the purchasers of the bricks.

The second two *Cornelius* factors—the nature of the property and its compatibility with expressive activity—also weigh in favor of a finding that the "walk of fame" was intended to become a limited public forum. The nature of the walkway is largely decorative, surrounding and embellishing the flagpoles. Unlike a military installation or government workplace, there is nothing in the nature of the walkway that makes it ill-suited for engravings. *Cf. Cornelius*, 473 U.S. at 805–06, 105 S.Ct. 3439 ("The federal workplace, like any place of employment, exists to accomplish the business of the employer."); *Greer v. Spock*, 424 U.S. 828, 838, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) ("[T]he business of a military installation [is] to train soldiers, not to provide a public forum"). The inscribed bricks are not incompatible with either the decorative nature of the walkway or its purpose as a paved pathway. Sidewalks—e.g. the Hollywood Walk of Fame—often bear inscriptions. Accordingly, both the nature of the property and its compatibility with expressive activity weigh in favor of a finding that the walk of fame is a limited public forum.

The Court holds that the walkway was a limited public forum because the school

---

**2.** The audience of the brochure advertising the "walkway of fame" appears to have been the families of students, who would use the inscriptions to honor their students, coaches, and/or sponsors. (Def.Ex. 12.) The fact that 33 of the bricks in the walkway contain phrases other than a student's, teacher's, or parent's name and the individual's graduating year or tenure demonstrates that the walkway was intended to allow limited expressive activity. (Def.Ex. 6.)

intended to reserve the forum for certain groups—students, families of students, teachers, and those associated with PFHS—for certain types of expressive activity. The question remains: what type of expressive activity did the school allow? The type of expressive activity or "topics" of discussion is important, because it will help to determine whether the school engaged in viewpoint discrimination. For example, if the school intended to limit the forum to school-sponsored activities, then prohibiting the Latin cross might be viewpoint neutral if a religious activity, like the Bible Club, was not a school-sponsored activity.

Plaintiffs contend that the purpose of the forum was to "commemorate attendance, employment or involvement in school-sponsored activities." (Pl. Mem. in Supp. 8.) The PAWS president at the time believed that "students would enjoy the opportunity to select a symbol that represented a school-sponsored activity in which they participated while a student at PFHS." (Slusher Aff. ¶ 28.) She claims that PAWS "never intended for the brick walkway to be a place for expressive activity or for students to express religious, philosophical or political beliefs or for students to inscribe these types of messages on their bricks." (Id. ¶ 34.)

Plaintiffs' argument construes the symbols as a means to express something of importance to the honoree. This argument is more persuasive than that of the Defendants. First, the symbols selected by PAWS for the bricks include non-school related symbols. Two symbols, in addition to the symbols for school-sponsored activities and the Latin cross, appear to be symbols of activities or interests not directly related to the school: the tree (possibly symbolizing an interest in environmentalism or farming) and the horseshoe (likely symbolizing equestrian activities). Defendants contend that they selected the horseshoe to "allow parents to wish 'good luck' to their children." (Slusher Aff. ¶ 24.) The tree, according to Slusher, stood for the "tree of knowledge." (Id. at ¶ 25.) The Court finds these contentions to be merely post hac rationalizations; they are uncorroborated and unconvincing. One honoree of a horseshoe brick was, unsurprisingly, a student who enjoyed horseback riding. (Compare Def. Ex. 6 at 2, with Pl. Mem. Ex. B. (showing Catie Weitershausen participated in equestrian activities)). No brick bears the tree as a symbol. However, it is argued that the tree symbol stood for the tree of knowledge.[3]

More important than the inclusion of the tree or horseshoe, the advertisements for the bricks exhorted students to choose symbols that personified them. The advertisements encouraged the students to purchase "personalized engraved bricks" and to "choose a symbol which best represents you." (Def.Ex. 15–16.) The advertisement did not ask the students to select their favorite school activity; instead, it asked to pick the symbol that represented them. In other words, brick buyers were encouraged to engage in a type of personification. The image and message on the brick—an abstraction—became the embodiment of the honoree. The Court finds that the school intended that the symbols would personify the student. In other

---

**3.** The Court is also somewhat confused as to why the school would argue that the tree symbol stood for the tree of knowledge, a symbol with religious connotations: "And the LORD God commanded the man, saying, Of every tree of the garden thou mayest freely eat: but of the tree of the knowledge of good and evil, thou shalt not eat of it: for in the day that thou eatest thereof thou shalt surely die." King James Bible, Genesis 2:16–17. The fact that the school included two religious symbols in its list and banned only one of them does not support its arguments.

words, the Court agrees with the Plaintiff that the purpose was to express something of importance to the honoree.

### 3. Limited Public Forum Analysis

■ The limited public forum is perhaps best understood as a hybrid of the traditional public and nonpublic fora: only open for expression on a limited number of topics. Therefore, it is not surprising that this hybrid forum employs two different standards: an indulgent one for which topics may be chosen, and rigorous standard for what may be said on those topics. Under the "internal standard," the government's exclusion of a speaker who falls within the class to which a limited public forum has been made generally available must pass strict scrutiny. *Goulart*, 345 F.3d at 250. Put another way, "as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum." *Id.* The "external standard" applies to "the government's ability to designate the class for whose especial benefit the forum has been opened." *Id.* The government's designation of the class for whose especial benefit the forum has been opened is "subject only to the standards applicable to restrictions on speakers in a nonpublic forum," namely that "the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Id.*

In a typical case involving a limited public forum, the Court would need to determine whether the "internal" or "external" standard of review applied. *See id.* In this case, however, the distinction is irrelevant, because the Court holds that under either standard the Defendant violated the Plaintiffs' right to freedom of speech.

### a. External Standard

Defendants argue that the "external" standard is applicable to its exclusion of the Latin cross from the walk of fame.

The important distinction for the Court's analysis is between content and viewpoint discrimination. The latter occurs when the government targets not the subject matter of the speakers' message (content discrimination), but the "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. In other words, viewpoint discrimination is the regulation of speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.; see also Virginia v. Black*, 538 U.S. 343, 361–62, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

The distinction between content and viewpoint discrimination is important, because content discrimination is permissible under the "external" standard for a limited public forum while viewpoint discrimination is not. *See Perry Educ. Ass'n*, 460 U.S. at 61–62, 103 S.Ct. 948 ("we have approved content-based restrictions on access to government property that is not a public forum . . . . [but] never held that government may allow discussion of a subject and then discriminate among viewpoints on that particular topic, even if the government for certain reasons may entirely exclude discussion of the subject from the forum.") Assuming that the external standard applies, PFHS engaged in impermissible viewpoint discrimination when it removed Plaintiffs' bricks from the walk of fame.

The Supreme Court has decided three cases seminal cases involving viewpoint discrimination in response to a perceived Establishment Clause violation: *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); and *Good News Club v. Milford Cent.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). In *Lamb's Chapel*, a

church brought an action alleging that the school district violated the Free Exercise Clause of the First Amendment by denying the church's request to use school facilities for a religiously oriented film series. 508 U.S. at 386–90, 113 S.Ct. 2141. The school district had a rule stating that "[t]he school premises shall not be used by any group for religious purposes." *Id.* at 387, 113 S.Ct. 2141. Relying upon a New York state court ruling prohibiting bible clubs from meeting on school property, the school district enforced its rule and prohibited the church from using the school's facilities. *Id.* The district contended that allowing the church to use the facilities would violate the Establishment Clause of the First Amendment.

The Court held that the school district violated the free speech clause of the First Amendment by engaging in unconstitutional viewpoint discrimination. While the school district was not under an obligation to permit after-hours use of its property, once it had opened the forum, it had an obligation not to discriminate against particular viewpoints. *Id.* at 393–94, 113 S.Ct. 2141. The school did not engage in content discrimination, because the subject matter of the film series, child rearing, was not placed off-limits to all speakers. *Id.* at 393, 113 S.Ct. 2141. Rather, the Plaintiff's "exhibition was denied solely because the series dealt with the subject [of child rearing] from a religious standpoint." *Id.* at 394, 113 S.Ct. 2141. Moreover, the Supreme Court rejected the school district's Establishment Clause defense, because there was "no realistic danger that the community would think that the District was endorsing religion" due to the variety of organizations using school property after hours. *Id.* at 395, 113 S.Ct. 2141.

In *Rosenberger,* a university student group which published a newspaper with a Christian editorial perspective sued the University of Virginia, alleging that the school's denial of funds for outside printing costs violated the Free Exercise Clause of the First Amendment. 515 U.S. at 823–27, 115 S.Ct. 2510. The University provided payments to outside contractors for the printing costs of a variety of student publications that were "related to the educational purpose of the University of Virginia." *Id.* at 824, 115 S.Ct. 2510. The school, however, refused to reimburse groups for "religious activities, philanthropic contributions and activities, political activities," *inter alia. Id.* at 825, 115 S.Ct. 2510. The guidelines promulgated by the school defined "religious activity" as the following: "any activity that 'primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality.' " *Id.* The school denied the student group's request for reimbursement for outside printing expenses, because it deemed the publication to fall within the definition of "religious activity." *Id.*

The Court held that the University engaged in viewpoint discrimination as opposed to content discrimination. "By the very terms of the ... prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831, 115 S.Ct. 2510. The Court drew a sharp distinction between the University's speech and private speech *facilitated* by the school: "A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id.* at 834, 115 S.Ct. 2510. Once the University "offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the University may not silence the expression of selected viewpoints." *Id.*

In *Good News Club,* a Christian club for children brought an action against the Mil-

ford Central School for alleged violations of its First Amendment rights arising out of the school's exclusion of the club from meeting after hours at the school. 533 U.S. at 103–04, 121 S.Ct. 2093. Under New York law, the Milford Central School District enacted a policy allowing district residents to use its building after school for, among other things, (1) instruction in education, learning, or the arts and (2) social, civic, recreational, and entertainment uses pertaining to the community welfare. *Id.* at 102, 121 S.Ct. 2093. Pursuant to this policy, the district denied the use of its building after school to Good News Club, a private Christian organization for children ages 6 to 12, on the grounds that the proposed use—to sing songs, hear Bible lessons, memorize scripture, and pray—was prohibited by the community use policy. *Id.* at 103, 121 S.Ct. 2093. The Court, relying on *Lamb's Chapel* and *Rosenberger,* held that the district engaged in viewpoint discrimination. *Id.* at 109, 121 S.Ct. 2093. The Good News Club sought to teach "a subject otherwise permitted under the rule, the teaching of morals and character, from a religious standpoint." *Id.* The Court held that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Id.* at 112, 121 S.Ct. 2093.

These cases stand for the unmistakable proposition that a school may not deny benefits to a group solely on account of their religious viewpoint. Whether that benefit is access to school facilities open to the public or paying for the cost of printing a journal, school policy must be neutral. Put another way, the school must choose who speaks based on criteria that do not involve religion. The school need not open its facilities up to private speech; but once it does allow for expressive activity, it may not discriminate against those speakers who express a religious viewpoint on an otherwise permissible topic.

In the instant case, the Defendants have engaged in viewpoint discrimination: those who honor a star athlete may adorn their bricks with a symbol, but those who honor a pious student may not. Defendants argue that their decision to remove the bricks was viewpoint neutral, because no religious, philosophical, evolutionary, or political symbols were allowed in the walk of fame. This alone, however, would still constitute viewpoint discrimination. Preventing speakers to discuss otherwise permitted subjects, like their achievements in high school, except from a religious, philosophical, evolutionary, or political viewpoint is exactly what the Supreme Court emphatically found unconstitutional in *Good News Club.* The purpose of the expression on the bricks was to express something of importance to the honoree. Brick purchasers were allowed to express themselves by choosing phrases and symbols that best expressed the honoree's interests. The school, however, censored those individuals who believed that the Latin cross was important to their honoree. Those students who believed that their high school career was marked by their faith were not permitted to celebrate their accomplishments, while the school allowed those who engaged in any number of athletic endeavors to inscribe their achievements on the "walk of fame."

The Defendants have not been able to distinguish *Lamb's Chapel, Rosenberger,* or *Good News Club.* As in those three cases, the school district here opened up a forum for private speakers to express themselves. PFHS certainly was under no obligation to open up the walkway to expressive activity. Once the school allowed private speakers to purchase bricks without limiting the symbols and phrases to school-sponsored activities or the names and years of attendance, they created a

forum for private speakers to express something of importance to their honoree. Accordingly, the school may not censor those individuals who wish to highlight the achievement of their students in matters of faith or religion. A parent who is proud of the faith of their student may express that feeling to the same degree as the parent of the "2001 State [Golf] Champion" or the "2000 State Champion [in] Wrestling." (Def. Ex. 6 at 1, 4.) The Court holds that the Defendants' removal of the bricks bearing the Latin cross constituted impermissible viewpoint discrimination.

### b. Internal Standard

The actions of the Defendants could still pass constitutional muster if they can pass strict scrutiny. The Defendants assert that the removal of the bricks passes strict scrutiny, because the school had a compelling interest to avoid an Establishment Clause violation and the policy was narrowly tailored to achieve that end. To pass strict scrutiny the government must show that the restriction on speech is (1) narrowly tailored to (2) promote a compelling government interest. *See PSINet, Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir.2004).

The Supreme Court has expressly not addressed this issue: "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.... we need

not, however, confront the issue in this case ...." *Good News Club*, 533 U.S. at 113, 121 S.Ct. 2093 (citations omitted). As discussed in § III:C, *infra*, the Court holds that the inclusion of the Latin cross in the walkway would not have violated the Establishment Clause. Accordingly, the Defendants lack a compelling government interest needed to pass strict scrutiny.[4]

### 4. School–Sponsored Speech

■ Defendants offer an alternative justification for the removal of the bricks: they argue that the bricks constitute school-sponsored speech. In *Hazelwood Sch. Dist. v. Kuhlmeier*, the Supreme Court defined "school-sponsored" speech as:

expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Hazelwood Sch. Dist.*, 484 U.S. at 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). School-sponsored speech may be restricted by the school so long as the restrictions are "reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562.[5] The

---

**4.** Since there is no Establishment Clause violation, the Court need not resolve the question left open in *Good News Club* as to whether avoiding an establishment clause violation could justify viewpoint discrimination.

**5.** The circuits are split as to whether restrictions on school-sponsored speech must be viewpoint neutral, as restrictions on speech in limited public fora must be. *Compare Fleming v. Jefferson County Sch. Dist.*, 298 F.3d 918, 926 (10th Cir.2002)(no requirement of viewpoint neutrality); *Ward v. Hickey*, 996 F.2d 448, 454 (1st Cir.1993) (same), *with*

*Planned Parenthood of Southern Nevada v. Clark County Sch. Dist.*, 941 F.2d 817, 829 (9th Cir.1991) (requiring viewpoint neutrality); *Kincaid v. Gibson*, 191 F.3d 719, 727 (6th Cir.1999)(noting that the *Hazelwood* court noted that viewpoint-based restrictions were part of its analysis); *Searcey v. Harris*, 888 F.2d 1314, 1319 n. 7 (11th Cir.1989) (requiring viewpoint neutrality). Since the Court holds that the bricks do not fall within *Hazelwood's* definition of "school-sponsored" speech, the Court need not determine whether viewpoint neutrality is required.

question presented is whether the bricks constitute "school-sponsored" speech within *Hazelwood.* The Court holds that the bricks are not "school-sponsored" speech, because they do not relate to a legitimate pedagogical concern.

In *Hazelwood,* student members of a high school newspaper filed suit against their high school claiming that their First Amendment rights had been violated by the school's censorship of two articles involving students' experiences with pregnancy and the impact of divorce on students. *Id.* at 263–65, 108 S.Ct. 562. The Supreme Court upheld the school's decision to censor the articles, holding that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562. In arriving at this conclusion, the Court held that the school newspaper could be "characterized as part of the school curriculum [because they were] supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271, 108 S.Ct. 562.

In the case most similar to the instant case, the Tenth Circuit, applying *Hazelwood,* held that a tile painting and installation project established by Columbine High School was "school-sponsored speech" over which school could exercise editorial control under the First Amendment since its actions were related to a legitimate pedagogical concern: "allowing participants to take part in the reconstruction of the school [for the purpose of] reacquainting the students with the school and participating in community healing . . . ." *Fleming,* 298 F.3d at 931. The court of appeals held that the tile project bore the imprimatur of the school and related to legitimate pedagogical concerns. *Id.* at 931–34. Although "the variety and

number of tiles would lead an observer to understand that the school itself did not paint the tiles," the court reasoned, "the observer would likely perceive that the school had a role in setting guidelines for, and ultimately approving, the tiles it allowed to become a part of the school itself . . . ." *Fleming,* 298 F.3d at 930. Since the school "permanently integrated the tiles into the school environment, and was significantly involved in the creation, funding, supervision, and screening process of the tile project" the court of appeals held that the tiles bore the imprimatur of the school. *Id.* at 931.

Moreover, the *Fleming* court held that the tiles involved a legitimate pedagogical concern. The tiles were part of a program developed by the school to reintroduce the students to the school after the horrific events that occurred there: "the purpose of reacquainting the students with the school and participating in community healing falls under the broad umbrella that courts have given to pedagogical purposes." *Id.*

In the instant case, the Court holds that the bricks do not bear the imprimatur of the school, because they do not relate to a legitimate pedagogical concern. *See Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562; *Fleming,* 298 F.3d at 930–31. Defendants contend that "the brick walkway's permanent record of student attendance and participation in school-sponsored activities implicated similar pedagogical interests" to those in the *Fleming* case. The Court disagrees. Assuming *arguendo* that the "walk of fame" was supervised by a faculty member, Defendants have failed to show how the walkway was "designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562. Attempting to reacquaint children to a building that was the site of killing spree by two fellow

students is qualitatively different than recording student attendance and participation. To whom is knowledge or skills being imparted? The bricks teach nothing, but rather commemorate a student's past accomplishments. Neither is there present the kind of community healing or bonding that occurred in *Fleming*. Accordingly, the Court finds that the walkway does not involve the type of pedagogical interest with which *Hazelwood* was concerned. The bricks, therefore, are not "school-sponsored" speech.

### C. Violation of the Establishment Clause

■ The Court will first address the application of the Establishment Clause of the First Amendment. While the Establishment Clause is often invoked to protect against the state's endorsement of religion over non-religion, it is equally applicable to claims that the state action is "hostile" to religion. *See Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)("the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion, thus 'preferring those who believe in no religion over those who do believe' ")(quoting *Zorach v. Clauson*, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952)).

The Court has already found that Defendants engaged in impermissible viewpoint discrimination. *See* § III:B(3)(a) *supra.* As the Supreme Court said in *Lamb's Chapel*, discrimination "against a particular point of view ... would ... flunk the test ... [of] *Cornelius*, provided that the defendants have no defense based on the establishment clause." *Lamb's Chapel*, 508 U.S. at 394, 113 S.Ct. 2141 (quoting *May v. Evansville–Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1114 (7th Cir.1986) (Posner, J.)). Therefore, the Court must address whether PFHS acted constitutionally in removing the bricks from the walk-

way. Resolution of this issue depends upon whether PFHS was acting to remedy an actual Establishment Clause violation caused by the inscription of the Latin cross on school property.

Whether a government practice or policy violates the Establishment Clause is governed by the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Myers v. Loudoun County Sch. Bd.*, 251 F.Supp.2d 1262, 1266 (E.D.Va.2003). Although several justices and other courts have criticized the test, *Lemon* remains binding law in this Circuit. *See Ehlers–Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 288 (4th Cir.2000); *Myers*, 251 F.Supp.2d at 1266. The basic framework for Establishment Clause challenges is well-settled: "[f]irst the [targeted] statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (internal quotations omitted); *Madison v. Riter*, 355 F.3d 310, 316 (4th Cir.2003). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

The Court agrees with the Plaintiffs that this case is best understood not in terms of whether the removal of the bricks violated the Establishment Clause, but rather whether the Defendants would have violated the Establishment Clause had they *not* removed the bricks containing the Latin cross from the walkway. Applying perspective will clarify the issues: if permanent inscriptions of the Latin cross on school property do not violate the Estab-

lishment Clause, then the Defendants have a defense to neither Plaintiff's Establishment Clause claim, nor the claim of a violation of the Free Speech clause. The Court will address each of the three *Lemon* prongs in turn.

### 1. Secular Purpose

The Court must resolve whether the school had a secular purpose in removing the bricks from the walkway. "In applying the purpose test, it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion.'" *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir.2003) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (O'Connor, J., concurring)). The Supreme Court will, generally, only invalidate a statute when it concludes that the statute or action was "motivated wholly by religious considerations." *Lynch*, 465 U.S. at 680, 104 S.Ct. 1355. "The secular purpose requirement presents a fairly low hurdle for the state." *Mellen*, 327 F.3d at 372 (citing *Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (internal citations and quotations omitted)).

The purpose of the walk of fame and the inscription of the Latin cross was motivated by a secular purpose. As stated above, the purpose of the walk of fame was to raise money for the school. This is certainly a secular purpose. Moreover, neither the school nor PAWS had any ulterior motives in selecting the Latin cross as a possible symbol for the bricks. The presence of the Latin cross in the walkway passes the first prong of the *Lemon* test.

### 2. Principal Effect

Regardless of the purposes motivating it, a governmental action may still fail *Lemon's* second prong. This "primary effect" prong must be assessed objectively, in order to measure whether the principal effect of government action "is to suggest government preference for a particular religious view or for religion in general." *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995). Put differently, "[t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Wallace*, 472 U.S. at 56 n. 42, 105 S.Ct. 2479 (internal quotation marks omitted).

Under the second *Lemon* prong, the Court has emphasized that the Establishment Clause is violated when a given governmental practice has the appearance or effect of *endorsing* religion. *Smith v. County of Albemarle, Va.*, 895 F.2d 953, 956 (4th Cir.1990). A finding of "endorsement" is predicated on a review of the nature and context of the contested object, "what viewers may fairly understand to be the purpose of the display." *Id.* A district court must engage in a fact specific analysis of the "particular physical setting," because "[e]very government practice must be judged in its unique circumstances to determine whether it [endorses] religion." *Id.* (quoting *Lynch*, 465 U.S. at 694, 104 S.Ct. 1355).

When analyzing whether a religious display has the appearance of endorsing religion, courts look to the nature and context of the contested object. In *County of Allegheny v. American Civil Liberties Union*, the Supreme Court held that a creche located on the Grand Staircase, the "main" and "most beautiful part" of the building that is the seat of county government violated the Establishment Clause, because "[n]o viewer could reasonably think that it occupies this location without the support and approval of the government." 492 U.S. 573, 599, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). "[B]y permitting the 'display of the creche in this particular physical setting,'" the Court explained, "the county sends an unmistakable message that it

supports and promotes the Christian praise to God that is the creche's religious message." *Id.* at 600, 109 S.Ct. 3086; *see also Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 772–73 (7th Cir. 2001) (holding that a six-ton limestone monument of the Ten Commandments located on the statehouse grounds conveyed to a reasonable observer the government's endorsement of religion); *Smith*, 895 F.2d at 958 (holding that a creche erected in front of the county office building sent the "unmistakable message" of endorsement of religion where the creche was not associated with any secular symbols or artifacts).

*Allegheny County* illustrates the importance of context: because the Court found that an 18-foot Chanukah menorah was combined with sufficient secular symbolism, the city's 45-foot Christmas tree and a sign saluting liberty, created "an overall holiday setting" and did not violate the Establishment Clause. *See Lynch*, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring). The Court reasoned

[t]he tree, moreover, is clearly the predominant element in the city's display. The 45-foot tree occupies the central position beneath the middle archway in front of the Grant Street entrance to the City–County Building; the 18-foot menorah is positioned to one side. Given this configuration, it is much more sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa. In the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season. In these circumstances, then, the combination of the tree and the menorah communicates, not a simultaneous endorsement of both the Christian and Jewish faiths, but instead, a secular celebration of Christmas coupled with an acknowledgment of Chanukah as a contemporaneous alternative tradition.

*Allegheny County*, 492 U.S. at 617–18, 109 S.Ct. 3086; *see also Capitol Square*, 515 U.S. at 770, 115 S.Ct. 2440 (holding that a Latin cross erected by the Klu Klux Klan in the public square outside the state capitol did not violate the Establishment Clause, because "[r]eligious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms."); *O'Bannon*, 259 F.3d at 773 (holding monumental display of the Ten Commandment unconstitutional where there were no "other monuments or statutes directly near[by] ... and ... no unifying historical or legal significance between this monument and the others.")

In the context of schools, courts generally strike down permanent displays of religious symbols affixed to school property. In *Stone v. Graham*, the Supreme Court held that a school's posting copies of the Ten Commandments in every classroom violated the Establishment Clause, because they were undeniably a religious symbol and were not integrated into the curriculum. 449 U.S. 39, 42, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). The Court stated, "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.* at 41, 101 S.Ct. 192. The fact that the copies were purchased with private money was irrelevant. *Id.* at 42, 101 S.Ct. 192. In *Washegesic v. Bloomingdale Public Sch.*, the Sixth Circuit affirmed the district court's order that a school district remove a portrait of Jesus from display in a school hallway. 33 F.3d 679, 683–84 (6th Cir. 1994).

Considering the context of the walk of fame, the Court holds that a reasonable observer would not interpret the Latin crosses on the bricks as an "unmistakable endorsement" of the Christian faith. The bricks must be understood in the context of the walkway as a whole. Almost every brick bore the name of a student or faculty member. An observer would first connect the symbol with the name on the brick. For example, the swimmer symbol on the brick honoring "Stacey E. Slaight" of the "Class of 2003" would suggest to the observer that she enjoyed swimming and probably was on the PFHS team. (Def. Ex. 6 at 4.) The Latin cross would be connected to the student and not to the school.[6] An observer would not, however, infer that the school endorsed swimming over other non-represented activities, like the Debate Club, the Key Club, or the Latin Club. (*See* Def. Ex. 41.) Unlike the creche in *Allegheny County*, the portrait of Jesus in *Washegesic*, or the copies of the Ten Commandments in *Stone*, the Latin cross-bricks were part of a much larger secular display. (*See* Pl.Ex. 20–29.) The walkway communicates a message of the diverse achievements of the graduates and faculty of the school. Like the menorah, tree, and sign display in *Allegheny County*, the message of the walkway is not one of endorsement of religion. Although the walkway is in a prominent place in the school—at the base of the flagpole in the front of the school—the setting is not the "main" or "most beautiful" part of the school like the grand staircase in county seat in *Allegheny County*.

Having examined the context of the bricks bearing the Latin cross, the Court finds that their inclusion in the "walk of fame" passes the second prong of the *Lemon* test, because they do not have the appearance or effect that the school is endorsing Christianity.

### 3. Excessive Entanglement

While the walkway met *Lemon's* first and second prongs, the walkway could still fail the constitutional test if it excessively entangles the school district with religious activity. *Lemon*, 403 U.S. at 615, 91 S.Ct. 2105. Considering the question of entanglement, a court must examine the character and purposes of the institution benefitted, the nature of the assistance provided by the State, and the resulting relationship between the government and the religious entity. *See Agostini*, 521 U.S. at 232, 117 S.Ct. 1997. The objective of the entanglement inquiry "is to prevent, as far as possible, the intrusion of either into the precincts of the other." *Lemon*, 403 U.S. at 614, 91 S.Ct. 2105. In *Mellen*, the Fourth Circuit held that the Virginia Military Institute ("VMI") had excessively entangled itself with religion by composing, mandating, and monitoring a daily prayer for its cadets. 327 F.3d at 375. The court of appeals stated, "VMI has taken a position on what constitutes appropriate religious worship—an entanglement with religious activity that is forbidden by the Establishment Clause." *Id.; see also Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 385 (6th Cir.1999) (finding excessive entanglement where "[t]he school board decided to include prayer in its public meetings, chose which member from the local religious community would give those

---

**6.** Similarly, when tourists visit the Hollywood Walk of Fame, they associate the symbol on the "star" with the honoree. Each "star" bears the name of the artist and an emblem identifying in which of the five categories—Motion Pictures, Television, Radio, Recording, or Live Theatre—the artist received the "star." *See http://en.wikipedia.org/wiki/Hollywood_Walk_of_Fame.* The purpose of the Hollywood Walk of Fame is to honor a particular star's contribution to a particular field of entertainment. Similarly, observers of PFHS's brick walkway understand that the symbol represents that student's achievements.

prayers, and ... had the school board president himself compose and deliver prayers to those in the audience").

In this case, the school district would not become excessively entangled with religion by allowing students to adorn their bricks with religious symbols. Unlike VMI, PFHS did not design the Latin cross symbol; the brick manufacturer provided the school with stock clip-art images. (Def.Ex. 19–20.) The school would not be taking a position "on what constitutes appropriate religious worship," but rather allow members of different religions to select symbols for the bricks. The school district, therefore, would act in a similar manner to the Virginia Veterans' Cemetery (Pl.Ex. 17) and offer a wide array of religious emblems for different faiths.

The fact that the school originally only offered the Latin cross does not, by itself, constitute excessive entanglement. Had the school only permitted the Latin cross and refused requests for other symbols, the Court would have found a violation of the Establishment Clause. The remedy, however, would have been to offer additional symbols and not to remove those in place. As the Court states in *Rosenberger*, "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." 515 U.S. at 839, 115 S.Ct. 2510. A neutral policy allowing students or family members to choose different religious symbols does not offend the Establishment Clause, but rather is required by it, once the government has opened up a public forum. *See id.* ("More than once have we rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in

broad-reaching government programs neutral in design").

The Court holds that permitting the Latin cross to be displayed on some of the bricks in the walk of fame would not excessively entangle the government with religion.

## IV. Conclusion

This the reasons stated above, the Court will grant summary judgment to the Plaintiffs. Defendants' motion for summary judgment is denied. An appropriate Order will issue.

## *AMENDED ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

(1) Plaintiffs' Motion for Summary Judgment is GRANTED as to Counts I–IV, VII;

(2) Defendants' Motion for Summary Judgment is DENIED;

(3) Defendants shall immediately return Plaintiffs' bricks to their former places in the "walk of fame" at PFHS; and

(4) the Clerk of the Court shall forward copies of this Order to all counsel of record.

This Order is final.